Winfred Muchira was born poor in Kenya and attended school for just eight years. She later served as a house girl in Saudi Arabia for the Apalis, a Saudi family. In order to bring her to the United States, the Saudi family submitted a contract to immigration that said that they would not have Ms. Muchira work more than 40 hours a week without overtime pay, that they would not take possession of her passport, that they would permit her to leave their house when she was not working, and that she would be treated humanely. But as soon as Ms. Muchira passed through customs, the Saudi family took her passport and kept it from her. As they were aware, she knew nobody in the United States, spoke little English, had no money of her own, and had no understanding of the protections that U.S. law provides. Whenever the Saudi family left their house, they would set their alarm system, and they did not provide Ms. Muchira with the code. So she knew that if she opened the front door, an alarm would go off. She thought she could not leave that house without the police coming and arresting her based on that alarm. And the evidence is that she never left the house. At all times that Ms. Muchira was under their control, the Saudi family monitored her movements, always kept her within their sight. They had her work 15 hours long days for less than a dollar an hour. They never gave her a day off. They did not permit her to sit on the furniture, and they did not allow her to go outside by herself except to take out the garbage. And even then, she was under surveillance. Notwithstanding, the district court granted summary judgment by finding, as a matter of law, that this conduct could not violate the forced labor statute, Title 18, Section 1589. Section 1589 broadly prohibits obtaining labor through, quote, serious harm or the threat of serious harm, which is defined expansively to in the same circumstances as the alleged trafficking victim to feel compelled to perform services. Now, a lot of your argument, I mean, a lot of your brief and opening of your argument dealt with the hours and wages that she was paid and required to work. I noticed that below the district judge denied the defendant's motion for summary judgment on the Fair Labor Standards Act cases, on your Fair Labor Standards Act claim. And the district court also denied summary judgment on the unjust enrichment claim. And as a result of that denial of summary judgment, those two claims were settled. And I guess what I'd like to ask you is that this forced labor statute serves a purpose which is distinct from the Fair Labor Standards Act cases and other cases dealing with the conditions of work. And so I fear that it could expand into a conditions of work claim. And that seems to me what the district court was concerned with. Because a lot of your complaint was my conditions were substandard and the district court agreed with you on that and denied summary judgment and you got payment for that. And I'm not saying that the conditions were great. I think you deserve the benefit of the inferences on that. I'm just worried about a statute which was designed to prohibit forced labor becoming a mini Fair Labor Standards Act. So what's your comment? Your Honor, the statute at issue here, the forced labor statute from the Trafficking Victims Protection Act of 2000 serves a very different purpose from the Fair Labor Standards Act. You are correct that the Fair Labor Standards Act was not the subject of the summary judgment and that those claims were settled. However, what the Trafficking Victims Protection Act was created to do was to address exactly the type of circumstance that we have in this case. And that is not just a situation where because somebody doesn't have means to find a better job, you're able to pay them less than the minimum wage. That would be a Fair Labor Standards Act claim. It's not to just address the situation where there is some condition of employment that is illegal. And Fair Labor Standards Act would address that as well. This addresses the circumstance in which people use what Congress called even subtle methods of control in order to compel an individual who is not in a position to resist to perform labor. Could you explain to me why it is of consequence that the alarm would go off if she decided to leave? Yes, Your Honor. This is a woman who was born in Kenya. She doesn't know anything about the laws in the United States. She testified that she believed if she opened that door and the alarm went off, the police would come and she would be arrested. And I think that a reasonable juror could conclude that the appellees... She found out later though that the police could come, would come, and did come to the House at her request. She did find that out later, Your Honor. And I think that that raises one of the problems with the District Court's analysis. Because what the District Court said was Section 1584 and Section 1589 are essentially the same statutes, and I'm going to treat them the same. They're very different. And what the District Court said the test was is whether, as a practical matter, she was not able to leave the House, or she was not able to leave the employment. I didn't see that being the District Court's standard. I think it took the... It applied the serious harm. And the question is, are you obtaining the... Are you obtaining the labor of this person by threatening them with the... The District Court didn't take into account psychological harm, but if you read its opinion, it expressly mentions psychological harm, which is part of the definitional section. I agree with you on that. But again, it's a question of just... I don't want this... I'm sympathetic that the the... We have loads of statutes to address that point. But this statute, I think as a matter of law, addresses a different problem. And that is where you compel somebody to work for you by threatening serious harm, when in the absence of those threats or serious harm, they would have left and sought other employment. Well, part of the problem here is that I don't know that she did seek other employment, and the reason she may not have is that she was here on a temporary visa. And that expired, and it would have made other unemployment... That would not have been available. But that isn't the... The absence of other employment opportunities, that's not the fault of the defendants. That's an outgrowth of her visa status, isn't it? Your Honor, with all respect, I think that is not the right question under the statute. No other case, no other court has posed the question as, was the plaintiff in a position to seek other employment? And did the plaintiff in fact seek other employment? Or did she not seek other employment because of the threats of serious harm? The issue is... The other cases here, and I look at the other cases, and they seem to involve, with all respect to you, comments or behavior of a very different order of magnitude. And the record in those other cases indicated physical mistreatment of the worker or sexual molestation. And I didn't see that here. Now, if I'm wrong, if there was physical mistreatment then... Or sexual molestation or threatened consequences, the district court said, there's no... I can't find that they threatened her with consequences if she terminated her employment. And so the circumstances here, as best I could gather from all those other circuit cases, they didn't seem to rise to that level. Physical abuse, sexual abuse, threatened consequences if you leave? Your Honor, first, Congress expressly said in Section 1589 itself that there doesn't need to be physical abuse or threat of physical abuse. Second, there was a threat made here. And the threat was, they took her passport. They held it. She testified that she thought she would be arrested if she was on the street without her papers. And they locked her in the house by setting an alarm system without giving her the code. Again, that is an implicit threat. You are not allowed to leave our house without our permission. That is exactly contrary to the contract that they submitted to immigration to get her into the country. And there are at least five facts that the district court found against my client without support in the record. First, the district court found that she knew all of the conditions of her employment prior to coming to the United States. That's wrong. There's no evidence in the record that she understood that any of the conditions that were set forth in that contract would not be abided except for the $400 per month as opposed to the $1,600 per month. The district court relied on that finding in reaching its decision. Second, the district court found that there was, quote, no evidence that anything defendants did caused Ms. Muchir to fear arrest if she left the house. Again, there are at least two things that they did that the district court did not address. They took and held her passport, and they locked her in the house using an alarm system. Third... Did she ever ask for her passport back? Your Honor, no. And there's extensive testimony about why she didn't do that, and that is because she was raised as a house girl in Saudi Arabia, where it is understood... It's a very, very different culture than the United States. It is understood when you are a servant to somebody in Saudi Arabia that they get to do what they want to do, and you are not in a position to ask them. On that question, there might be a very good reason for the household employer to keep the passport in case questions were raised about the plaintiff or in case she was arrested or in a case where she was arrested, and not be accused of hiring someone who was in the country unlawfully. There's one other piece of evidence that concerned me here, and that is she told this family that she didn't want to return to Saudi Arabia with them. Fair enough. And then the defendant, as I understand it, and correct me if I'm wrong, purchased a ticket to Kenya for her on the same day that the family had left for Saudi Arabia. Now, if you intend on keeping somebody from, you know, in a position of bondage or forced labor, why would you just willingly purchase a ticket to Kenya for her on the day the family left for Saudi Arabia? Your Honor, the record is clear on that point. What they did was they purchased her a ticket to Kenya on that day and a ticket from Kenya back to Saudi Arabia two weeks later. And the to Saudi Arabia, given the culture in Kenya, given the culture in Saudi Arabia. But the culture in Kenya is not the defendant's fault. I mean, you say she felt she didn't have any choice and everything, but a lot of this is due to the status of her visa and to Kenyan cultural conditions. And you can't just saddle the defendant with all of those things. Your Honor, I'm not blaming the defendants for that culture. But I am, I think we can in a reasonable jury, a reasonable juror could charge them with knowledge of that culture and what effect it would have on Ms. Muchira given the actions they took in the United States. I wanted to just quickly address your prior question about the keeping of the passport. Could you address it on rebuttal or? I could, Your Honor. I was just going to say, I think keeping a copy of that passport certainly would have addressed your concern and that certainly they can make arguments, but a reasonable jury should be permitted to weigh the evidence and determine whether or not that's the reason the passport was kept. Hold on a second. We have no questions. Thank you. May it please the Court, I'm Neil Koslow with me, Louisa Cairo, representing the defendants. Counsel did not mention, I think, the key point in the statute, which is the scienta requirement. The third word of that section, 1589, says, whoever knowingly deprives somebody or forces somebody to labor. And that requirement, as the Ninth Circuit held in the Dan case, which they rely on, and the Second Circuit held in the Rivera case, requires that the defendants knowingly, intentionally impose force, serious harm on the victim, and intend that the victim believe that as a result of that harm, they will stay in the employ of the employer. And the District Court carefully reviewed the entire record and found no evidence whatsoever to satisfy that scienta requirement. No knowing intentional imposition of serious harm by the  I'd like to just refer briefly to two exchanges, which I think are very important in the record. This was a question at the deposition that we posed to Ms. Machira. It's on pages 285 and 286 of the Joint Appendix. Is there anything they did to verbally and psychologically abuse you while you were living in the United States? Answer. If I remember, I'm going to say about them. Next question. What was that? I didn't hear it. The response. The response was, if I remember, I'm going to say about them. There was, by the way, a translator there. And at any time Ms. Machira could have asked for help from the translator if she did not understand the question. Next question. What's the worst thing that they did, that they ever did to you while you were living in the United States? Answer. Making me to overwork while I was alone, while everybody was. I'm the one who was working and denying my rights of my contract salary and denying my contract agreement that they're going to take me to the church. And they did not do according to my request in the contract. And as your honor pointed out, the wage claim was settled under the supervision of the United States. The only issue here, which the district court had to grapple with, was whether there was forced labor, whether there was serious harm. And under the three requirements, number one, number two, the harm had to be serious, so much serious, not only as the reasonable, as the individual might feel it, but as a reasonable person might determine it. And third. Let me ask you this. What explanation do you have for the fact that when they left the house and went on a trip, they left her inside with the alarm turned on, but without a code to turn it off? What explanation is there for that? Well, your honor, there's none in the record. And the reason why there's none in the record, I offered early on under the Eastern District of Virginia practice, foreigners are not normally hauled into court, hauled into Virginia for depositions. And all of the defendants were in Saudi. I offered to have a Skype deposition of all the defendants. The plaintiffs turned me down and they said, no, we don't want to do that. Instead, if they testify at trial two weeks before trial, will you agree to allow us to depose them? And I agreed. So there's nothing in the record from the defendants. But this is summary judgment, isn't it? Yes, it is. You could have submitted an affidavit. We, we, the only thing that we said on that point was that Ms. Muchira never requested to know the code so that she could go out when she wanted to. And for the first three months when she was living in Virginia, she was living in her own apartment and she testified that she went as she pleased. And she was outside the apartment on her own with no supervision and no knowledge. And, and then your honor, we have 15,000 Facebook postings. We didn't get them when we asked for them. We got them on the eve of, on the day before New Year's, December 30th, 2013. After the close of business, we had requested that in September, we had to file a motion to compel. We get 15,000 Facebook postings, which she sent and received on a smartphone that the defendants gave her. That smartphone allowed her to communicate with the world. And she did. This is not evidence of people who were trying to imprison somebody or lock somebody up. This is evidence to the contrary. And that's what the district judge, Judge Tringer, relied on. And Judge Tringer bent over backwards. Normally in a summary judgment context, you would have facts which one side says and the other side contests. And then the district judge has to determine whether there was a dispute of material fact. Here, because the plaintiffs decided not to depose the defendants, all we had was basically Ms. Muchira's testimony. The only conflicts were the conflicts between what she said at deposition and what she said in the Facebook postings and what she said to the authorities when she was released. And the district judge said, I'm not going to credit any testimony in the record which is in conflict with her deposition testimony. Nevertheless, the district judge, Judge Tringer, found that in the 15,000 Facebook postings, over and over, Ms. Muchira talked about how happy the circumstances were, the pleasure that she was enjoying, the trips she took, the shopping sprees. She transmitted pictures of her at an ice skating rink in New York City at an apartment store. This is not, as Judge Wilkerson pointed out, this is not like any of the other cases of forced labor. There was no infliction of any kind of harm, certainly not knowingly. There was an expert report in the case, an expert about the forced labor question, and why wouldn't that report in and of itself create an issue of fact for a jury? Well, for the expert, there were a couple of expert reports. One of the expert reports, which the defendants, which the plaintiff relied on, from Dr. Goldsmith, and he was the one who portrayed Ms. Muchira, he didn't say in his expert report that he had reviewed the 15,000 postings from the Facebook. In fact, he said he forgot to mention it. The plaintiff's lawyers told they knew about it. They said they forgot to tell us. We only knew about it when, in the course of the deposition, Dr. Goldsmith testified that he knew about it. But he never asked Ms. Muchira about those postings. And so in his testimony, which was subsequent to his expert report, he said, I wish I had had the opportunity to ask her about the inconsistencies between what she told me and what she was posting. So I think that expert, I think Judge Trenga looking at that expert report and all the expert reports did not believe that that created a material issue of fact. Also, Your Honor, we had our own expert, Andrew Klein. Mr. Klein was the former head of the Civil Rights Unit at the United States Department of Justice. He created the unit for prosecuting trafficking cases. He himself prosecuted 50 or 60 such cases. His expert report was that he was appalled that this case was ever brought, that it was ever filed in district court. And he said in his expert report and in his testimony that at the Justice Department, they were always worried about the possibility of somebody gaining the system. The majority of these cases the courts have found are believable cases of abuse. This wasn't one of those cases. I think it's not only that this case was the claim here on forced labor was the primary issue that the plaintiff has raised, but it's the only issue. As we pointed out in our brief, the other issues either were dismissed and are not appealed from at all. And the three other trafficking claims, plaintiff says that they were based on Judge Trenga's finding on 1589. That's not so. Judge Trenga found no violation of 1584 or 1589 or any other predicate statute under the TVPA. And so those claims fall as well. Judge Trenga is an experienced district judge. And one month before he issued this summary judgment ruling in our favor, he issued a judgment against foreigners who had trafficked someone into the United States and he issued a judgment for $750,000. Judge Trenga knows a legitimate trafficking case when this wasn't one of them. I'm not sure that's relevant because it's another case. But on this particular case, I don't think he had it in for you. It seemed to me that if the case were anything, it was the conditions and payment, wages and terms and conditions of employment. Well, wages in terms of conditions of employment is right at the heart of the Fair Labor Standards Act. And he denied summary judgment on that. And of course, you know, when you deny summary judgment on something that often leads to a settlement, and it did here. And he did the same thing with the unjust enrichment claim under state law. So he didn't think that the employer was any kind of saint here and that the conditions were up to snuff. But I think what he was just trying to do was to look at the statute and say this is aimed at a distinct ill. And when, really, when you compare the facts of this case to those in the other circuits, I just, they seem to me almost as different as night and day in terms of what was in those other circuits constituted forced labor. I agree completely. Are there other questions? Thank you very much. There may be, wait. Oh, sorry. Okay. Thank you, Your Honor. This is a case that was decided on summary judgment. The question is not whether their expert was better than our expert. The question is not whether Mr. Koslow could have cross-examined the plaintiff with materials that he thinks show that she was not abused. Do you know how many of the Facebook posts, the 15,000 Facebook posts, showed Mr. Koslow was not abused? Outside of the defendant's house by herself? That would be zero. 15,000 Facebook posts, not a single one of them suggest that she was ever outside of that house. Why? Because they set an alarm system to keep her in there. That's not a violation of the Fair Labor Standards Act. That is a circumstance in which an individual knowingly takes a step in order to compel somebody to perform labor that they would not otherwise have performed. And here, it resulted in a woman working for 15 hours a day for less than a dollar an hour with no vacation. That's different from a Fair Labor Standards Act claim. This addresses a different harm. Again, the other cases, for example, in the Ninth Circuit case, the victim was not only not paid at all for the work, but was forced to sleep on the floor, was rationed food, was physically attacked, and threatened to be sent to her native country, but only after paying the employer $8,000. And then in another case, the victim was forced to drink alcohol, was forced to strip, was groped by customers, was raped. And many of the other cases are in the same vein where the victim is not allowed to speak with her family. They were beaten, raped, and raped. I haven't found a case that really was . . . It just seems to me of a different order of magnitude here. So much of what you're trying to pile on the shoulders of the defendant is . . . seems to me to be due to extraneous circumstances like the time of the visa and the conditions in Kenya and the absence of other employment opportunities. But that's not on them. You can't lay that . . . I don't think the district court felt that he could lay that at the feet of the defendants here. Your Honor, there are not that many cases on the statute. It's only 8 years old as amended, 16 years old overall. Well, that's plenty of time for the litigation to get going. The standard that Congress set forth, but that the district court never mentioned in its analysis, is whether a reasonable person of the same background in the same circumstances as the victim would have felt compelled to provide labor. And when Congress passed the statute, it said, we're doing this because we want to address increasingly subtle methods of control. You don't have to rape somebody to violate the TVPA. What the TVPA is about, Section 1589, is addressing what Congress felt was an overly restrictive test that the United States Supreme Court had applied to Section 1584 and the 13th Amendment in U.S. v. Kosminsky. And so what they did was they created a statute that allows a jury to consider all of the circumstances, those that favor the plaintiffs and those that favor the defendant. What the district court did here was effectively find, Your Honor, I think that, well, maybe it wasn't so bad. And that's respectfully not a summary judgment question. There was clear evidence in the record. That's really not what the district court did at all. The question was, whether the district court, I think, framed it correctly. And that is whether they obtained the labor or services of this individual by means of serious harm or threats of serious harm to that person or another. And the question is, what is the serious harm or threat of serious harm that was directed at her or another person? And that was what the district court asked. And that's right out of the text of the statute. Fisherman, at 1045, Your Honor, the district court says the critical inquiry is whether defendant's physical or psychological coercion as a practical matter eliminates the ability to exercise free will or choice. That's not the right standard. And here, Your Honor, this Court first needs to determine what is the right standard, because this is summary judgment being reviewed de novo, and then apply it to determine whether there were material disputes of fact. And there is clear evidence in the record of actions that could have led a reasonable juror to conclude that a woman from Kenya, without understanding of this country's laws, would have felt she was going to be arrested. I just don't know how you can say the district court applied an incorrect standard. The statute is quoted. The elements of the statute are quoted. The thing is, it's taken right out of the book. Serious harm or threatened serious harm that required, that led them to knowingly obtain the labor or services of the plaintiff. But I think the district court did an exceedingly thorough job with this, and I just don't know. It seems to me a lot of what you're doing is taking liberties with what the trial court actually, the nature of the trial court's inquiry. Your Honor, the trial court's analysis, when it found against my client, never addressed the taking of the passport or the setting of the alarm system. Thank you. Your Honor, thank you. We'll come down in Greek Council and move into our final case.
judges: J. Harvie Wilkinson III, William B. Traxler Jr., Bruce H. Hendricks